# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

JOHN SHERMAN HENDRICKSON, JR.,  :
                                :

          Plaintiff          :     No. 3:11-CV-02197

                                :

        vs.               :     (Judge Nealon)

                                :

CAROLYN W. COLVIN, ACTING      :

COMMISSIONER OF SOCIAL        :

SECURITY,                    :

                                :

          Defendant      :

**FILED**
**SCRANTON**

MAY 2 3 2013

PER _____
DEPUTY CLERK

<u>MEMORANDUM</u>

## Background

        The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff John Sherman Hendrickson, Jr.'s claim for social security disability insurance benefits and supplemental security income benefits.

        Hendrickson protectively filed[1] on January 20, 2010, an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 12, 150-160 and 166.[2]  On May 5, 2010, the Bureau of Disability Determination[3]

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on January 23, 2012.

3.  The Bureau of Disability Determination is an agency of the
                                       (continued...)

denied Hendrickson's applications. Tr. 12, 84 and 86-96. On May 25, 2010, Hendrickson requested a hearing before an administrative law judge. Tr. 12 and 99-100. After about 11 months had passed, a hearing was held on April 19, 2011. Tr. 12 and 27-83. On April 25, 2011, the administrative law judge issued a decision denying Hendrickson's applications. Tr. 12-22. On June 24, 2011, Hendrickson requested that the Appeals Council review the administrative law judge's decision and on September 30, 2011, the Appeals Council concluded that there was no basis upon which to grant Hendrickson's request for review. Tr. 1-8. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Hendrickson then filed a complaint in this court on November 25, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on May 20, 2012, when Hendrickson filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being

---

3. (...continued)
state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 88 and 93.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

insured is commonly referred to as the "date last insured." It is undisputed that Hendrickson meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 12 and 14, 164 and 200.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Hendrickson, who was born in the United States on November 19, 1966,[5] withdrew from school in 1982 after completing the 9th grade. Tr. 84, 150, 157 and 172. Hendrickson can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 170 and 185. During his elementary and secondary schooling, Hendrickson attended regular education classes. Tr. 172. After withdrawing from school, Hendrickson did not obtain a General Equivalency Diploma or complete any type of special job or vocational training. Tr. 20 and 172. He is described as an individual with a limited education. Id.

---

5. At all times relevant to this matter Hendrickson was considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Hendrickson has past relevant employment[6] as (1) a construction painter which was described as skilled, medium work by a vocational expert, and (2) a spray painter which was described as semi-skilled, medium work.[7] Tr. 77.  In documents

---

6.  Past relevant employment in the present case means work performed by Hendrickson during the 15 years prior to the date his claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

7.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(continued...)

4

filed with the Social Security Administration, Hendrickson reported that his work history spanned the years 1996 to early 2008 and that he worked as a painter, plumber, construction laborer, and edge trimmer in a shoe factory. Tr. 192-199 and 208.

Records of the Social Security Administration reveal that Hendrickson had earnings in the years 1984 through 1990, 1993 through 1998, and 2000 through 2008. Tr. 165. Hendrickson's highest annual earnings were $34,147.95 in 1997. Id. Hendrickson's total reported earnings were $297,520.26. Id. Hendrickson testified at the administrative hearing held in this case on April 19, 2011, that he has not worked since May 27, 2008, the date he alleges he became disabled. Tr. 37, 150 and 157.

Hendrickson claims that he became disabled because of degenerative joint disease of both the cervical and lumbar spine, foraminal and central spinal canal stenosis, spondylosis, radiculopathy of the upper and lower extremities and arthritis in both hands.[8] Tr. 32 and 190. The impetus alleged by Hendrickson

---

7. (...continued)
    (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

8. Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs. The intervertebral discs, the soft cushions between 24 of the bony vertebral bodies,
                                         (continued...)

have a tough outer layer and an inner core composed of a gelatin-
like substance, the nucleus pulposus. The outer layer of an
intervertebral disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of the disc extends beyond the
perimeter of the vertebral bodies. A herniation is where the
nucleus pulposus goes beyond its normal boundary into the annulus
and presses the annulus outward or ruptures the annulus. Such
bulges (protrusions) and herniations if they contact nerve tissue
can cause pain. Degenerative disc disease (discogenic disease)
has been described as follows:

> As we age, the water and protein content of the
> cartilage of the body changes. This change results in
> weaker, more fragile and thin cartilage. Because both
> the discs and the joints that stack the vertebrae
> (facet joints) are partly composed of cartilage, these
> areas are subject to wear and tear over time
> (degenerative changes). The gradual deterioration of
> the disc between the vertebrae is referred to as
> degenerative disc disease. . . Wear of the facet
> cartilage and the bony changes of the adjacent joint is
> referred to as degenerative facet joint disease or
> osteoarthritis of the spine. Trauma injury to the spine
> can also lead to degenerative disc disease.

> Degeneration of the disc is medically referred to as
> spondylosis. Spondylosis can be noted on x-ray tests or
> MRI scanning of the spine as a narrowing of the normal
> "disc space" between the adjacent vertebrae.

> Degeneration of the disc tissue makes the disc more
> susceptible to herniation. Degeneration of the disc can
> cause local pain in the affected area. Any level of the
> spine can be affected by disc degeneration. When disc
> degeneration affects the spine of the neck, it is
> referred to as cervical disc disease. When the mid-back
> is affected, the condition is referred to as thoracic
> disc disease. Disc degeneration that affects the lumbar
> spine can cause chronic low back pain (referred to as
> lumbago) or irritation of a spinal nerve to cause pain
> radiating down the leg (sciatica). Lumbago causes pain
> localized to the low back and is common in older
> people. Degenerative arthritis (osteoarthritis) of the
> facet joints is also a cause of localized lumbar pain
> that can be detected with plain x-ray testing is also
(continued...)

for his present condition is a work-related incident in April, 2008, where he was leaning out a third floor window pulling a foam gun and the hoses attached to it up from the ground floor when he felt pain in his neck and shoulder blades. Tr. 265, 269 and 283. Hendrickson contends he suffers from debilitating pain in his neck, shoulders, arms, low back and legs and it impacts his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and use his hands. Tr. 187 and 190.

---

8.  (...continued)
        a cause of localized lumbar pain. The pain
        from degenerative disc disease of the spine is usually
        treated conservatively with intermittent heat, rest,
        rehabilitative exercises, and medications to relieve
        pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet. com/degenerativedisc/page2.htm (Last accessed May 20, 2013). Degenerative disc disease is considered part of the normal aging process. Id.
        Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com /radiculopathy/article.htm (Last accessed May 20, 2013). A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id. However, "the majority of patients respond well to conservative treatment options." Id. Radiculitis is "inflamation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, 1571 (32nd Ed. 2012).

Hendrickson's complaints are corroborated by Terry Straw, a friend of Hendrickson, who signed a statement on March 3, 2011, which states in part as follows:

> The undersigned has known John Hendrickson for over the past 8 years. When I first knew John, he enjoyed his job as a painter and worked many hours. He loved doing sports with his son. . . He helped coach Little League . . . was an avid hunter and fisherman. Loved boating . . . Since his accident, I have seen him become less and less able to do almost anything. He has become a friend that is in pain most of the time. He has trouble and pain doing most tasks. Has given up hunting, fishing, boating and hiking. No longer coaches . . . needs help in doing small repairs and jobs to maintain his house. He has problems getting in and out of vehicles, walking any distance, unable to go [up] stairs, and just hurts to sit or stand any length of of time. John has become dependent on pain medicine to relieve his symptoms, so he is able to participate in somewhat of an enjoyable day. He appears to be in pain while getting dress[ed], showering, getting in and out of chairs and sofas . . . .

Tr. 217-218.

For the reasons set forth below, the case will be remanded to the Commissioner for further proceedings.

**Standard of Review**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight

9

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92. This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[9] (2) has an impairment that is
severe or a combination of impairments that is severe,[10] (3) has

---

9. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit." 20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

10. The determination of whether a claimant has any severe
(continued...)

11

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national

---

10.  (...continued)
impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before the Court addresses the administrative law judge's decision and the arguments of counsel, some of Hendrickson's medical records will be addressed.

The alleged disability onset date is May 27, 2008. The Court will start by reviewing a few medical records which reveal

---

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

treatment and examinations prior to that date because they relate to a potential cause of Hendrickson's present condition.

On April 13, 2008, Hendrickson visited the emergency department at the Pinnacle Health System Hospital in Harrisburg, Pennsylvania, seeking treatment for bilateral arm pain, right thumb pain, neck pain, back pain, tingling in his arms and elbows, decreased strength in his left hand, and difficulty sleeping. Tr. 234-235 and 303-304. He also complained of a "burning feeling" in all four extremities." Tr. 303. The diagnostic impression was bilateral carpal tunnel syndrome, cervical strain, scapular pain, thigh pain, and upper back pain - "all muscular ligamentous." Tr. 235. The physical examination performed during this visit did not reveal any deficits in Hendrickson's musculoskeletal range of motion other than his pain increased with motion. Tr. 234. X-rays of Hendrickson's cervical spine revealed that he had "[n]arrowing involving the posterior disc spaces of C5-C6 and C6-C7." Tr. 299. It was, however, noted that "dedicated views of the cervical spine including oblique views are recommended to evaluate for encroachment of the neural foramina that may be causing the patient's symptoms." Id. Prior to this visit Hendrickson had been working "up to 14 to 16 hours per day." Tr. 234. Hendrickson's primary care physician at this time was Robert A. Ettlinger, M.D. The record reveals that Dr. Ettlinger was sent copies of the

records of Hendrickson's visit to the emergency department. Tr. 235.

On April 16, 2008, Hendrickson was evaluated by Steven M. DeLuca, D.O., at Orthopedic Institute of Pennsylvania, located in Camp Hill based on a request from Dr. Ettlinger. Tr. 236 and 250-251. After conducting a clinical interview and physical examination and reviewing the x-rays taken on April 13, 2008, Dr. DeLuca's assessment was that Hendrickson suffered from degenerative disc disease with possible cervical spinal stenosis at the C5-C6 and C6-C7 levels and significant basilar joint arthritis of the right thumb. Tr. 251. Dr. DeLuca, however, ordered an MRI of the cervical spine in light of Hendrickson's complaints and abnormal upper extremity reflexes in order to make sure that he was not suffering from spinal stenosis. Id. Dr. DeLuca started Hendrickson on a 12-day Medrol Dosepak, which is a corticosteroid medication used to treat, inter alia, arthritis. Id. Also, Dr. DeLuca noted that depending on the results of the MRI, he would start Hendrickson "on epidural steroids and even consider Neurontin."[13] The record reveals that Dr. Ettlinger received a copy of Dr. DeLuca's examination notes. Tr. 251.

_____

13. Neurontin is a drug used to treat epilepsy but it is also used to treat pain. Neurontin, Drugs.com, http://www.drugs. com/neurontin.html (Last accessed May 20, 2013).

15

The MRI of Hendrickson's spine was performed on April 19, 2008, and revealed that he had (1) moderately severe bilateral foraminal stenosis at the C5-C6 level, (2) moderate foraminal stenosis on the right side at the C6-C7 level, (3) mild foraminal stenosis on the left side at the C6-C7 level, and (4) mild to moderate central canal stenosis at the C5-C6 level.[14] Tr. 236.

On April 23, 2008, Dr. DeLuca reviewed the MRI with Hendrickson. Tr. 251-252. In the report of this appointment Dr. DeLuca stated that the MRI demonstrated significant degenerative disc disease at the C5-C6 with mild to moderate central canal stenosis and severe bilateral neural foramina stenosis, and significant degenerative disc disease at the C6-C7 levels with moderate bilateral foraminal stenosis right greater than left. Tr. 251. Dr. DeLuca scheduled Hendrickson for a series of epidural steroid injections. Tr. 252. Dr. DeLuca noted in the report of this appointment that Hendrickson "may be looking at [surgery] but, based on age and his activity level, [recommended] exhausting all conservative care prior to considering [surgery]." Id. He also advised Hendrickson to continue taking non-steroidal pain medications and noted that at the next visit, there might be consideration given to a course of physical therapy. Id. Dr.

14. Stenosis is the narrowing of the spinal canal and it can also refer to the narrowing of the neural foramina which are the openings along the spine on both sides through which nerve roots exit.

16

Ettlinger was provided a copy of the report of this appointment. _Id._

Hendrickson received a series of epidural steroid injections commencing in May, 2008. Tr. 237-242 and 252. In June, 2008, Dr. DeLuca prescribed pain medications and referred Hendrickson for physical therapy. Tr. 253. At a physical therapy appointment on July 14, 2008, Hendrickson stated that his neck range of motion was "better now" but he still had "the same pain he had when he first came in." Tr. 263. A range of motion examination on this date revealed that Hendrickson had a 10 degree deficit in left and right cervical side bending; a 15 degree deficit in cervical rotation to the right and 5 degrees to the left; and a 10 degree deficit in cervical extension. Tr. 264. Dr. DeLuca, after examining Hendrickson on July 30, 2008, referred Hendrickson for an electromyography (EMG) of the upper extremities. Tr. 254. Dr. DeLuca, at that July 30th examination, also discussed with Hendrickson the option of surgery but that he would have to cease smoking before any such surgery would be an option. _Id._

Hendrickson attended 17 physical therapy sessions before reaching a plateau in August, 2008. Tr. 259-270. Hendrickson was discharged from physical therapy on August 11, 2008, because of nonattendance. Tr. 259.

The electromyography was performed on September 19, 2008, by Steven E. Morganstein, D.O. Tr. 243-249. The results were abnormal and revealed right cervical radiculopathy primarily at "the C6 nerve root level with some findings indicating C7 involvement as well." Tr. 244.

On September 22, 2008, Hendrickson was examined by Chad Rutter, D.O., in connection with an ongoing worker's compensation proceeding filed by Hendrickson. Tr. 283-289. After reviewing the x-rays of April 13th and the MRI of April 19th, conducting a clinical interview and performing a physical examination, Dr. Rutter concluded that the alleged work injury in early April, 2008, was not the cause of Hendrickson's condition. Id. Dr. Rutter noted that Hendrickson had no upper extremity radicular symptoms but he did not review the results of the recent EMG performed by Dr. Morganstein. Id. Dr. Rutter completed a physical capacities assessment form in which he stated that Hendrickson could in an 8-hour workday stand/walk 6-8 hours, sit 6-8 hours and drive 6-8 hours; Hendrickson could frequently bend, squat, crawl, climb and reach; Hendrickson could occasionally lift/carry 21 to 50 pounds and frequently 11 to 20 pounds; and Hendrickson had no limitations with respect to pushing/pulling and gross and fine manipulation with the hands or feet. Tr. 287. Dr. Rutter rated Hendrickson as capable of performing medium work. Tr. 288.

At an appointment with Dr. DeLuca on September 24, 2008, Dr. DeLuca reviewed the results of the recent electromyography with Hendrickson. Tr. 255-256. Dr. DeLuca in the report of this appointment which was provided to Dr. Ettlinger stated that the electromyography "confirms that this foraminal stenosis in the cervical spine is causing his upper extremity dysesthesias."[15] Tr. 255. Dr. DeLuca's assessment after reviewing the results of the EMG and performing a physical examination was that Hendrickson suffered from (1) degenerative disc disease with neural foraminal stenosis at the C5-C6 and C6-C7 levels, and (2) C6 and C7 right upper extremity radiculopathy. Id. Dr. DeLuca advised Hendrickson that it was his opinion that Hendrickson "would benefit greatly from an anterior cervical discectomy at C5-6 and C6-7 with an anterior cervical fusion." Tr. 256. Hendrickson was advised that before such surgery was performed and for at least 3 months after the surgery he would have to stop smoking. Id. Dr. Ettlinger was provided with a copy of Dr. DeLuca's report of this appointment. Id.

The record reveals that Hendrickson had appointments with Dr. Ettlinger, his primary care physician, on November 30, 2009; February 22, March 22, August 23, and October 11, 2010; and

---

15. Dysesthesia is defined as "distortion of any sense, especially that of touch" or "an unpleasant abnormal sensation produced by normal stimuli." Dorland's Illustrated Medical Dictionary, 577 (32nd Ed. 2012).

January 11 and February 14, 2011. Tr. 363-365, 366-367, 368-369 and 461-471. The notes of these appointments do not reveal detailed objective physical examination findings other than spinal tenderness, neck tenderness to palpation, and occasional reports of limited range of motion or pain with motion. Id. Dr. Ettlinger's diagnosis was consistently low back pain and cervicalgia[16] and he prescribed narcotic pain medications. Id.

On April 26, 2010, Hendrickson was examined by Bruce Goodman, M.D., on behalf of the Bureau of Disability Determination. Tr. 370-374. Dr. Goodman after reviewing the MRI of April, 2008, and conducting a clinical interview and performing a physical examination concluded that Hendrickson could engage in a limited range of light work. Id. Dr. Goodman found limitations in Hendrickson's ability to engage in postural activities. Tr. 374. Specifically, Hendrickson could only engage in occasional[17] bending, kneeling, stooping and crouching and never engage in

16. "Cervicalgia is neck pain that occurs toward the rear or the side of the cervical vertebrae . . . The term cervicalgia covers a broad range of neck pain causes, including whiplash . . . It also could be caused by a number of abnormalities in the region of the cervical vertebra, including a bulging disc, a pinched nerve, narrowing of the spinal canal (stenosis), spinal arthritis or degenerative disc disease." Michael Perry, M.D., Cevicalagia, Laser Spine Institute, http://www.laserspineinstitut e.com/back_problems/neck_pain/overview/cervicalgia/ (Last accessed May 21, 2013).

17. "Occasional" under the regulations of the Social Security Administration is up to 1/3 of an 8-hour workday or 2.67 hours.

20

balancing or climbing. Tr. 374. Furthermore, Dr. Goodman found that Hendrickson had one environmental limitation: the avoidance of heights. Id. Dr. Goodman's physical examination of Hendrickson revealed that Hendrickson had limited cervical and lumbar range of motion, including that Hendrickson's lumbar flexion (forward bending) was limited to 20 degrees while the normal range was 90 degrees. Tr. 371.

On May 4, 2010, Candelaria Legaspi, M.D., completed a functional assessment of Hendrickson on behalf of the Bureau of Disability Determination. Tr. 375-382. Dr. Legaspi concluded that Hendrickson could engage in a limited range of light work. Id. The only limitation found by Dr. Legaspi was that Hendrickson needed a sit/stand option which could be accommodated by normal breaks. Tr. 376. Dr. Legaspi did not examine Hendrickson but merely performed a records review and he did not explain why he did not accept the postural and environmental limitations imposed by Dr. Goodman. Dr. Legaspi further appears not to have recognized the significant limitation that Dr. Goodman found in Hendrickson's lumbar flexion (bending forward).

On November 8, 2010, Dr. Ettlinger wrote a "Two Whom It May Concern" letter in which he stated in toto as follows:

> John Hendrickson continues to be under treatment in our office for chronic back pain. He is currently narcotic dependent, and my recent visits have shown that he is not able to do sustained employment that involves persistent use or positioning of the back. I anticipate

this condition to be permanent at this point.
Tr. 455.

On November 16, 2010, Dr. Ettlinger completed an employability assessment form on behalf of Hendrickson in which he stated that Hendrickson "has a physical . . . condition that is expected to last for 12 months or more, and precludes **ANY FORM** of employment, on a sustained basis, of at least 30 hours per week." Tr. 453.

On or about February 12, 2011, Hendrickson was involved in a motor vehicle accident where he was "a belted front seat passenger" in a car that was rear-ended by a truck. Tr. 456. Hendrickson was transported to the emergency department at the Pinnacle Health Hospital in Harrisburg, treated at that facility and discharged the same day. Tr. 456-457.

On April 1, 2011, Dr. Ettlinger wrote a letter to Hendrickson's attorney which states in relevant part as follows:

> John Hendrickson . . . is under my care for narcotic dependent back pain. He currently has to walk with a cane often, is only able to do minimal activities around the house, and is fully disabled with regard to employment at this time, and in the foreseeable future.

Tr. 472.

## Discussion

The administrative law judge, at step one of the sequential evaluation process, found that Hendrickson had not

engaged in substantial gainful work activity since May 27, 2008, the alleged disability onset date. Tr. 14.

At step two of the sequential evaluation process, the administrative law judge found that Hendrickson had the following severe impairments: "Lumbar and Cervical Degenerative Disc Disease with Foraminal Stenosis and Spondylosis, Bilateral Carpal Tunnel Syndrome with Basilar Arthritis[.]" Id.

At step three of the sequential evaluation process, the administrative law judge found that Hendrickson's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15.

At step four of the sequential evaluation process, the administrative law judge found that Hendrickson could not perform his past relevant medium work but that he had the residual functional capacity to perform a limited range of light work. Tr. 15-20. The only limitation imposed by the administrative law judge was that Hendrickson could only engage in occasional fingering. In setting this residual functional capacity, however, the ALJ claimed that she gave significant weight to the findings of Dr. DeLuca, Dr. Goodman and Dr. Legaspi but does not explain why she rejected all of the postural limitations imposed by Dr. Goodman who actually examined Hendrickson in contrast to Dr. Legaspi who only reviewed the medical records up to May 4, 2010. As stated earlier, there is no explanation why Dr. Legaspi

23

rejected the postural limitations imposed by Dr. Goodman. Also, in setting the residual functional capacity, the administrative law judge rejected the opinion of Dr. Ettlinger who treated Hendrickson over an extended period of time and who received Hendrickson's records of treatment by Dr. DeLuca and other sources including reports of the diagnostic tests (X-rays, MRI and EMG) and the physical therapy. In setting the residual functional capacity, the administrative law judge also found that Hendrickson's medically determinable impairments could reasonably be expected to cause his alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform a limited range of light work. Tr. 16. In doing so, the administrative law judge did not address the statement from Terry Straw. Tr. 217-218.

Based on the above residual functional capacity (in essence the full range of light work except for being limited to occasional fingering) and the testimony of a vocational expert, the administrative law judge, at step five of the sequential evaluation process, found that Hendrickson could perform work as a gate guard and companion, and that there were a significant number of such jobs in the local, regional and national economies. Tr. 21.

The administrative record in this case is 516 pages in length, primarily consisting of medical and vocational records.

Hendrickson essentially argues that the residual functional capacity set by the ALJ is incomplete and inaccurate, that the ALJ inappropriately considered his credibility, the ALJ did not appropriately evaluate the opinion of Dr. Goodman and Dr. Ettlinger, and that the ALJ's step five determination is not supported by substantial evidence because the hypothetical question posed to the vocational expert did not include all of Hendrickson's physical limitations. The Court has thoroughly reviewed the record in this case and finds merit in Hendrickson's arguments.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.

In rejecting the opinion of Dr. Ettlinger, the ALJ merely stated as follows:

> Limited weight is given to the treatment notes and correspondence of Dr. Ettlinger, who often appears to overstate the claimant's symptoms and impairments

in light of claimant's admitted abilities to perform his activities of daily living.

Tr. 20. This is an insufficient reason as well as it does not appear to be accurate. A review of the record does not support the ALJ's assertion that Dr. Ettlinger overstated Hendrickson's symptoms and impairments especially in light of the statement from Terry Straw which the ALJ did not even consider. Furthermore, although Hendrickson admittedly engaged in some activities of daily living, those activities do not translate into the ability to engage in full-time work (8 hours per day, 5 days per week).

At step five of the sequential evaluation process the burden is on the Commissioner to produce evidence demonstrating that other work exists in significant numbers in the national economy that the applicant can perform. 20 C.F.R. §§ 416.912 and 416.960(c). It is important, therefore, to incorporate all physical limitations, including postural, supported by the record into a hypothetical question asked of a vocational expert. Dr. Goodman concluded that Hendrickson could only occasionally bend, kneel, stoop, and crouch, and never climb stairs or balance. The ALJ gave no explanation for rejecting the postural limitations imposed by Dr. Goodman. Those postural limitations were not incorporated into the hypothetical asked of the vocational expert. Consequently, the ALJ's step five analysis is defective.

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.   Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated and the case will be remanded to the Commissioner for further proceedings.

An appropriate order will be entered.


_____
**United States District Judge**


Dated: May 23, 2013